UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------- x
LYNDA MAUZE,

               Plaintiff,

      - against -

CBS CORPORATION,
               Defendant.
------------------------------------------------------- x

**FILED**
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

★   **OCT 19 2018**   ★

BROOKLYN OFFICE

**MEMORANDUM & ORDER**
15-CV-4905 (RJD) (SLT)

DEARIE, District Judge

     Following her termination from CBS Corporation ("CBS") in April 2014, Plaintiff Lynda Mauze ("Mauze"), a former Manager of Sports Production Services ("SPS") at CBS, initiated this discrimination action against CBS. Mauze alleges that by refusing to promote her and raise her pay, and by later firing her, CBS discriminated against her on the basis of race and sex, created a hostile work environment, and retaliated against her in response to her informal and formal complaints, all in violation of Title VII, 42 U.S.C. § 1981, the New York State Human Rights Law, New York State Executive Law § 296 et seq. ("NYSHRL"), the Administrative Code of the City of New York § 8-101 et seq. ("NYCHRL"), the Equal Pay Act ("EPA"), 29 U.S.C. §206 et seq., and the New York Equal Pay Act, New York Labor Law § 194. CBS moves for summary judgment on all claims, arguing that Mauze was fired for insubordination, failing to perform, and abandoning her job duties. See CBS Mem. in Supp. of Mot. for Summ. J., ECF No. 44 ("CBS Mem."); CBS Reply in Supp. of Mot for Summ. J., ECF No. 53 ("CBS Reply"); Mauze Mem. in Opp. to CBS Mem., ECF No. 43 ("Mauze Opp'n"). CBS's motion is granted, except as to Mauze's retaliation claim.

BACKGROUND

## BACKGROUND

The following facts are taken from CBS's Local Rule 56.1 Statement in Support of CBS's Motion for Summary Judgment ("CBS 56.1")[1], ECF No. 46, and supporting documents, unless they are material and disputed, in which case attribution to Mauze's Local Rule 56.1 Statement, ECF No. 43, Ex. 1 ("Mauze Counter 56.1" or "Mauze Add'l 56.1"), or record cites, is indicated.

Mauze, an African-American woman, was hired by CBS in 2002 as a Commercial Coordinator for Broadcast Operations. See Mauze Add'l 56.1 ¶ 3. In February 2008, Mauze was promoted to Manager of Sports Production Services (SPS), a role she held until her termination in February 2013. CBS 56.1 ¶ 1. With her promotion, Mauze received a raise to an annual salary of $70,000, CBS 56.1 ¶¶ 2-3, and reported to Arthur Harris ("Harris"), an African-American man and Vice President of Broadcast Operations, CBS 56.1 ¶ 4; Jones Decl., ECF No. 43 ("Jones Decl."), Ex. 1, Mauze Dep. ("Mauze Dep.") at 109:20-25. The Broadcast Operations Department handles operations for the transmission of sporting events for which CBS is the broadcaster or distributor.[2] CBS 56.1 ¶ 9. As Manager, SPS, Mauze's primary function involved building commercial formats for broadcasts based on advertising contracts negotiated between CBS's Sales Department and its sponsors. CBS 56.1 ¶ 6.[3] Mauze alleges that soon after she assumed this position, she "requested and received permission from her supervisors, Arthur Harris and Ken Aagaard ("Aagaard") Harris's manager and head of Broadcast

---

[1] Due to overlapping numbering in CBS's 56.1 Statement, the Court identifies the first reference to a given paragraph with the letter "a," and the duplicate reference to that paragraph with the letter "b."

[2] The Broadcast Operations Department typically has three or four employees, including a Director, Manager of Broadcast Operations, Manager of Sports Production Services, and Coordinator. CBS 56.1 ¶ 10. The Director of Broadcast Operations is responsible for managing technical aspects of the broadcast, and directing employees and freelancers in the control room. CBS 56.1 ¶ 11. The Manager of Broadcast Operations assists the Director(s) and performs many of the same functions, but has less responsibility. CBS 56.1 ¶ 12. Mauze disputes that the Director of Broadcast Operations had supervisory responsibilities. Mauze Counter 56.1 ¶ 11.

[3] Mauze alleges that she worked only for CBS Sports Broadcast, not CBS Sports. Mauze Counter 56.1 ¶ 6.

Operations, to assume duties that had previously been delegated to the Director of Sales."

Mauze Opp'n at 1; Mauze Add'l 56.1 ¶ 17; Oldis Dep. ("Oldis Dep.") at 48:7-8. CBS disputes this assertion. CBS 56.1 ¶ 17.

In January 2012, Mauze emailed Harris to ask for a raise and promotion to Director of Sports Production Services. CBS 56.1 ¶ 14; Jones Decl., Ex. 5, Jan. 26, 2012 Email from Mauze to Harris. She copied Ken Aagaard ("Aagaard"), Harris's supervisor and head of Broadcast Operations, on her email. Mauze Add'l 56.1 ¶ 22; Salins Decl., ECF No. 47 ("Salins Decl."), Ex. D, Oldis Dep. ("Oldis Dep.") at 48:7-8. Harris responded that the changes planned for the department did not include Sports Production Services. CBS 56.1 ¶ 18; Jones Decl., Ex. 5, Sept. 27, 2012 Email from Harris to Mauze. A few months later, in September 2012, Mauze called Hazel-Ann Mayers ("Mayers"), CBS's Assistant General Counsel and Chief Compliance Officer, and complained about her lack of opportunity for a promotion. CBS 56.1 ¶ 20; Mauze Add'l 56.1 ¶¶ 34-35. Mauze alleges that she also made claims of "adverse actions and hostile work environment against Mr. Harris and for discrimination in promotional opportunities and pay disparity against [Ken] Aagaard." Mauze Opp'n at 2; Mauze Add'l 56.1 ¶ 34. CBS asserts that Mauze did not claim discrimination at this time. CBS 56.1 ¶¶ 23-25. Mayers then asked Kevin Oldis ("Oldis"), VP of Human Resources, to look into Mauze's complaint. CBS 56.1 ¶¶ 23-24. Mauze told Oldis that Harris was denying her opportunities and was difficult to work with. CBS 56.1 ¶ 25. Harris was subsequently transferred out of Mauze's department. CBS 56.1 ¶ 28. As a result, in January 2013, Mauze began reporting to Scott Davis ("Davis"), a white man, who replaced Harris as Vice President of Broadcast Operations. CBS 56.1 ¶ 29. Davis originally applied for the open position of Director of Broadcast Operations. Mauze Add'l 56.1 ¶ 62; Jones Decl., Ex. 5, Davis Dep. ("Davis Dep") at 27:14-23. Davis had five direct reports:

3

Doug Jackson ("Jackson"), Director of Broadcast Operations; George Dimotheris ("Dimotheris"), Director of Broadcast Operations; Kevin Burroughs ("Burroughs"), Manager of Broadcast Operations; Mauze, Manager of Sports Production Services; and Shoshana Salmon ("Salmon"), Coordinator of Broadcast Operations. CBS 56.1 ¶ 32. Of them, three—Burroughs, Salmon, and Jackson—were African-American. CBS 56.1 ¶ 33; Mauze Counter 56.1 ¶ 33.

Beginning in June 2013, CBS began to reorganize and streamline certain processes between CBS Sports and CBS Sports Network ("CBSSN"), CBS's cable division, and suggested that these divisions be treated as a cohesive operating unit. CBS 56.1 ¶¶ 34a-38a. Mauze disputes that this relationship between the divisions existed. Mauze Counter 56.1 ¶ 34 ("CBS Sports and CBS Sports Network [] were separate divisions of CBS, with different budgets and separate sales and "traffic teams"). However, Mauze alleges that, after several discussions with him, Aagaard told her that she would be "taken care of" in the reorganization. Mauze Add'l 56.1 ¶¶ 48-49, 67-69. In addition, Patty Power ("Power"), a white woman, was promoted to Senior Vice-President of Operations, and became Davis's direct supervisor. CBS 56.1 ¶ 39a. Later that summer, Davis fired Jackson, and Burroughs took over Jackson's responsibilities. CBS 56.1 ¶ 37b. Because he was capable of filling the role and was already "operating at that capacity,"[4] Davis formally promoted Burroughs to Director in August 2013. CBS 56.1 ¶¶ 38b-39b; see also Salins Decl., Exs. E, F, G, H (job descriptions and postings for Manager, Broadcast Operations and Director, Broadcast Operations roles).

Upon learning about Burroughs's promotion, Mauze complained to Power, noting that Burroughs did not have a college degree. CBS 56.1 ¶ 46. Mauze also complained to Mayers, alleging that she "believe[d] that [she] ha[d] been discriminat[ed] against because of [her] sex

---

[4] CBS explains that Burroughs began working for CBS Sports as a freelancer in 1999, and was hired as Manager, Broadcast Operations, in 2012. CBS 56.1 ¶¶ 40-42.

and...blacklisted by Ken Aagaard and denied any and all opportunity for advancement in [her] department." CBS 56.1 ¶ 49; Salins Decl., Ex K., Mauze email to Mayers 8/30/2013. She also complained that she had "made numerous verbal and written attempts to receive a formal review" and "submitted proposals for [her] advancement as recently as March to Ken aagaard via email." Salins Decl, Ex. K. Mauze was upset because Burroughs and Dimotheris were hired into Manager positions after her, but surpassed her in title and pay. Mauze Add'l 56.1 ¶¶ 95, 98. Mauze subsequently told Oldis that she wanted clarification about her job description and whether there was additional opportunity for her at CBS. CBS 56.1 ¶¶ 50-51. According to Oldis, Mauze "wanted the director's title...[but] wasn't looking for a wider role. She wanted the title for what she did" already. CBS 56.1 ¶ 52.

Mauze asserts that Davis cancelled several meetings with her before she, Oldis, Davis, and Power finally discussed her concerns on October 18, 2013. Mauze Add'l 56.1 ¶ 103; CBS 56.1 ¶¶ 53-55. Around the same time, Oldis forwarded Davis an email from Mauze in which she complained that Davis had cancelled meetings with Mauze. Mauze Add'l 56.1 ¶¶ 105-108; Jones Decl. Ex. 16, Oct. 4, 2013 Email from Mauze to Oldis. Davis responded "I'll be sure to scrape the bus tire marks off my back by then!" Id. Mauze alleges that Davis was "angry" that Mauze had "thrown him under the bus."[5] Mauze Add'l 56.1 ¶¶ 105-108; Salins Decl., Ex. G, Davis Dep. ("Davis Dep.") at 107:22-24. Oldis does not recall Davis being upset by Mauze's complaints. Oldis Dep. at 86:5-16. At the end of the meeting, Mauze and Davis agreed to each prepare job descriptions for Mauze's role, outlining the scope of her responsibilities.[6] CBS 56.1

---

[5] Mauze notes that Oldis reminded Davis that Mauze had the right to raise her concerns with HR and reminded him that "actions impact people." Mauze Add'l 56.1 ¶ 109 (citing Oldis Dep. at 85-86, 101). This assertion is unsupported by Mauze's record cites, and certain of the referenced deposition pages are not included in the record. However, our consideration of this statement does not affect the outcome of our analysis of Mauze's claims.
[6] Mauze asserts that she had previously presented Davis and Aagaard with a position statement "outlining her accretion of duties" and that "lack of any written performance evaluations contributed to the disconnect between [her] and management's understanding of the scope of her duties and assignments." Mauze Counter 56.1 ¶¶ 55-56.

¶ 56. Mauze submitted her job description on November 22, 2013. CBS 56.1 ¶ 57; Salins Decl., Ex. M, Mauze Job Description.

Davis also prepared a job description: his included that Mauze was responsible for coordinating with multiple CSD distribution platforms (CBSSN and CBSSports.com) for delivery and execution of commercial requirements, and "other duties as assigned." CBS 56.1 ¶¶ 59-60; Salins Decl., Ex. N, Davis Job Description. Mauze testified that she did not recall these responsibilities being included in the job description she received. Salins Decl., Ex. A, Mauze Dep. ("Mauze Dep.") at 141:24-144:21. She also asserts that "building CBSSN's commercial formats was [not] within the reasonable scope of her employment" and that, to justify her lack of upgrade/promotion and salary increase, Davis used the "as assigned" provision in her job description to require her to perform duties he had previously removed. Mauze Counter 56.1 ¶¶ 59-60; Salins Decl., Ex N. She alleges that CBS's version of her job description removed duties that were "added since her hire," and that she had inherited certain duties from the former Director of Sales soon after she became the Manager, SPS. Mauze Add'l 56.1 ¶¶ 126-27. Davis questioned Mauze's assertion that she "collaborat[ed] with executives to understand business objectives," because it suggested that she had "an executive level job and a strategic role," and he did not believe this was one of Mauze's responsibilities. Salins Decl, Ex. C, Davis Dep. at 85:8-20. After reviewing her job description, Davis and Power concluded that Mauze's title and salary did not warrant adjustment; this message was communicated to Mauze by Davis and Human Resources Manager Michelle Ahmad on November 25, 2013. CBS 56.1 ¶¶ 58, 61a-64a. Mauze accepted the new job description. CBS 56.1 ¶ 64a.

Mauze's performance soon began to decline. See generally CBS 56.1 § V. According to Mauze, incidents began to occur as a result of her complaints, Mauze Add'l 56.1 ¶ 129, and

because she "stopped doing the job [she] created and was not being compensated for," CBS 56.1 ¶ 64a, including tasks that her supervisors viewed as within her responsibilities. She also sang "this is not my job" in the workplace. CBS 56.1 ¶ 66a; Mauze Dep. at 55:3-6. In addition, though she was invited to meetings with VPs and high-level executives, she chose not to attend, CBS 56.1 ¶ 108a, because she viewed her attendance as "unnecessary," Mauze Counter 56.1 ¶ 108a.

One Sunday in early September 2013, Mauze arrived at CBS's Studio 43 and found no chair at her work station. CBS 56.1 ¶¶ 62b-64b. According to Burroughs, this oversight was "completely unintentional." CBS 56.1 ¶ 66b. Upon realizing that her chair was missing, Mauze walked out of the studio. CBS 56.1 ¶ 64b. When Mauze returned, she complained to Davis, who asked her to find a chair. CBS 56.1 ¶¶ 67b-68b. When Mauze refused, Burroughs retrieved one from a nearby room. CBS 56.1 ¶¶ 68b-69b. Davis later discussed Mauze's behavior with her, indicating that her role on Sundays was "pivotal." CBS 56.1 ¶ 74; Salins Decl., Ex. 21, Transcript of Conversation between Mauze & Oldis, at 15:2-6. Mauze responded "if it is pivotal, Kevin, wouldn't I have a seat?" Id. at 15:7-8.

On Sunday, November 17, 2013, Mauze arrived at Studio 43 and found someone in her usual seat. CBS 56.1 ¶ 75. Davis told Mauze that Dimotheris was training that individual, and asked Mauze to sit in a different spot—behind where she normally sat. CBS 56.1 ¶ 75. CBS contends that the alternative seat had all of the equipment Mauze needed to do her job, CBS 56.1 ¶ 78, however, Mauze left the studio and told Aagaard and Power that there was "no position" for her and no "tools to perform her job," CBS 56.1 ¶¶ 77, 79; Mauze Add'l 56.1 ¶ 160, and that she was insulted to be put in the corner,[7] Mauze Add'l 56.1 ¶¶ 155, 160. Mauze alleges that

---

[7] There is no evidence that Davis told Mauze to sit in the corner. CBS 56.1 ¶ 80.

Power spoke to her about the incident and told her that she was too emotional. Mauze Dep. at 263:3-19. Mauze felt that this was a racially derogatory remark. Id. at 263:14-19. Power then sent Mauze home. CBS 56.1 ¶ 81. Mauze alleges that approximately one week later, she entered a room where Power was sitting in a chair. Mauze Add'l 56.1 ¶ 150. Power said to Mauze "Oh girl, am I sitting in your seat, girl?" Mauze Add'l 56.1 ¶ 151. Mauze explains that referring to a black woman as "girl" in this context was racially-charged, and that Power's comment was discriminatory. Mauze Dep. at 262:16-263:19; Jones Decl., Ex. 12, WRLN, "Black Women On Being Called 'Girl' In The Workplace," May 15, 2017.

Additional performance-related incidents occurred between November 2013 and February 2014.[8] First, Mauze failed to show up at work on November 24 and December 1, two consecutive Sundays during the NFL season. CBS 56.1 ¶¶ 93a-95a. Though she was expected to be at work by 12:30 p.m., she did not tell her team that she was sick until 10:43 a.m. and 10:52 a.m., respectively. CBS 56.1 ¶ 93a. Mauze's late notice made it hard for CBS to find a substitute. CBS 56.1 ¶ 95a. Power emailed Davis and Michelle Ahmad of Human Resources "second Sunday in a row Lynda has called in sick. It's time…" Jones Decl., Ex. 47, Dec. 1, 2013 Power Email to Oldis and Ahmad; Power Dep. at 105:1-6 (Power meant "[i]t is time to start documenting Lynda's performance"). Oldis called Mauze to discuss her absence. CBS 56.1 ¶ 96a. Mauze told Oldis that Davis and Power were not communicating honestly and in good faith. Mauze Counter 56.1 ¶ 96. Mauze says that Oldis told her he would meet with them. Id.

---

[8] CBS alleges that on November 19 and 20, 2013, Mauze failed to respond to an urgent email from Dan Weinberg, Senior Vice-President at CBS Sports, despite the fact that she had access to work emails on her cell phone. CBS 56.1 ¶ 94a. Mauze disputes this assertion, arguing that Weinberg's inquiry was sent on her day off and that she responded in a timely fashion. Mauze Counter 56.1 ¶ 94.

Two days later, on December 3, Mauze submitted a complaint to the EEOC, alleging gender and race discrimination based on wages and promotions under Title VII of the EPA. Mauze Add'l 56.1 ¶ 179. On December 14, CBS received notice from the EEOC that Mauze had contacted the EEOC but had not filed a formal Charge of Discrimination. Mauze Add'l 56.1 ¶ 181. Mauze filed her formal Charge of Discrimination on December 23, 2013, including specific allegations about Scott Davis, in addition to her compensation-related complaints. Mauze Add'l 56.1 ¶ 182. CBS was faxed a copy of Mauze's Charge of Discrimination on January 11, 2014. Mauze Add'l 56.1 ¶ 183.

Mauze alleges that during her time at CBS, Davis made derogatory comments about women—in particular, his wife—and said that "women shouldn't carry things." Mauze Dep. at 257:2-264:14. Mauze never reported these comments to HR.[9] Mauze Dep. at 259:15-17. She claims that after CBS received her EEOC charge, Davis "again demand[ed] that [she] perform duties [] specifically [] removed from her job description" and that she felt "bullied" into performing them. Mauze Add'l 56.1 ¶¶ 184, 189. Mauze also claims that after Davis learned of her EEOC complaint, he stopped speaking to her. Mauze Add'l 56.1 ¶ 192. She also claims that he limited Mauze, Salmon, and Dana Rowinski, a white woman who replaced Salmon as Coordinator of Broadcast Operations, to clerical and administrative roles. Mauze Dep. at 264:20-25.

Next, on January 28, 2014, Mauze questioned the need to participate in a software conversion process. CBS 56.1 ¶ 92b. Davis told her that doing so was not an addition to her

---

[9] Mauze asserts that other women have raised allegations of misconduct against Davis based on race and gender. Mauze Counter 56.1 ¶ 167 (noting that "Ms. Rowinski and Ashley Brown, [have] each raised allegations of misconduct by Davis based on race and gender"). In particular, Mauze notes that after her termination, Rowinski "became Davis's designated punching bag" and "reported a similar pattern of retaliation." Mauze Opp'n at 15; Jones Decl., Ex. 35 (CD of audio recording between Mauze and Rowinski).

responsibilities. CBS 56.1 ¶¶ 93b-95b. Mauze argues that it was not within her job description, and that Davis tried to justify his request by referring to the 'duties as assigned' portion of her new job description. Mauze Counter 56.1 ¶ 93a. Davis later discussed this issue with Mauze, as well as poor performance, lateness, and lack of participation in meetings. CBS 56.1 ¶¶ 95b-96b.

The following month, Mauze was scheduled to take vacation. CBS 56.1 ¶ 97b. Before she left, she met with Helen Nomikos ("Nomikos") and Susan Jacobs ("Jacobs"), who Davis assigned to cover for her. CBS 56.1 ¶ 100. Both complained that Mauze refused to answer certain questions and told them to ask Davis instead. CBS 56.1 ¶¶ 100-103. Mauze asserts that she answered every question asked of her and referred Nomikos and Jacobs to Davis only for "new sales information or other last-minute changes," and that she prepared Nomikos as Davis instructed. Mauze Counter 56.1 ¶¶ 101; Mauze Add'l 56.1 ¶¶ 197-232. Mauze also made comments to Nomikos about CBS having a hostile work environment. CBS 56.1 ¶ 102. Finally, Mauze extended her vacation by a day without receiving approval. CBS 56.1 ¶¶ 98-99. She says this happened due to a clerical error. Mauze Counter 56.1 ¶¶ 98-99.

When Mauze returned to the office on February 27, 2014, she received a final performance warning from Davis and Ray Gutierrez ("Gutierrez"), Senior Vice President of Human Resources, for her (1) unwillingness to follow Davis's instructions regarding preparation for her vacation; (2) unauthorized extension of her vacation; (3) unwillingness to train Nomikos and Jacobs prior to Mauze's vacation; and (4) unprofessional behavior and unresponsiveness. CBS 56.1 ¶¶ 105a-107a; Salins Decl., Ex. X, Mauze Final Termination Warning.[10] Mauze

---

[10] The final written warning read: "These types of performance issues are not acceptable and will not be tolerated. Your communication with me and your colleagues must be improved upon immediately and permanently. Additionally, please be advised that failure or intentional refusal to follow directions or to perform assigned work constitutes insubordination under company policy, and is grounds for an immediate termination for cause. . . . Please understand that failure to show immediate and sustained improvement will result in further disciplinary action, up to and including termination of your employment." Salins Decl., Ex X, Mauze Final Written Warning.

explains that the written warning was based on false justifications, prepared just over two months after CBS received her EEOC complaint, and drafted while CBS was preparing its Position Statement in response to her EEOC complaint.[11] Mauze Counter 56.1 ¶ 105. However, according to CBS, colleagues found Mauze difficult to work with, unreliable, and unprofessional. CBS 56.1 ¶¶ 83-92. Mauze disputes this claim, arguing that "there exist[s] no contemporaneous, pre-litigation [] evidence supporting the proposition of current CBS employees that they thought Ms. Mauze was difficult to work with, unprofessional and unreliable." Mauze Counter 56.1 ¶¶ 83-84.

Additional issues occurred in March and April 2013, which are "critical months" for CBS Sports, because it broadcasts the NCAA Men's Basketball Tournament and the Masters Golf Tournament. CBS 56.1 ¶ 107b. CBSSN also airs Masters programming, including "Masters on the Range." CBS 56.1 ¶ 108b. Each year, CBS provides instructions for formatting and commercial rotations to CBSSN for its Masters on the Range broadcasts and Masters re-airs. CBS 56.1 ¶ 109. Until CBSSN receives instructions from CBS, its programming and traffic departments cannot fully prepare for the CBSSN Masters broadcasts. CBS 56.1 ¶ 113. Mauze claims that while she had *previously* assisted her CBSSN counterparts with this formatting, doing so was no longer her job, and "it was not a legitimate expectation that [she] prepare CBSSN's commercial formats where [CBSSN] had a team of employees who were paid to prepare [them] and who, with Ms. Mauze's assistance," had done so in the past. Mauze Counter 56.1 ¶ 114. Mauze says she told individuals at CBSSN that she would send them CBS formats, which they

---

[11] Mauze also suggests that CBS Legal, Human Resources, Scott, Power, and Oldis were aware of her EEOC complaint at the time. Mauze Add'l 56.1 ¶ 235. After the meeting, an HR Vice President suggested to Oldis that Mauze was "[f]iguring out a plan." Mauze Add'l 56.1 ¶ 243.

could use to build the formats they needed.[12]  Mauze Add'l 56.1 ¶ 295; Mauze Dep. at 216:2-19. CBS disagrees.  It claims that Mauze was expected to assist her CBSSN colleagues "as needed" in the week leading up to the Final Four, just as she had in the past.  CBS 56.1 ¶ 114.

On March 4, 2014, CBS filed its Position Statement in response to Mauze's EEOC Charge of Discrimination.  Mauze Add'l 56.1 ¶ 244.  On March 31, Mauze was late in providing commercial formats for the Final Four, and failed to respond to Davis for almost five hours after he inquired about them.  CBS 56.1 ¶¶ 115-116.  Mauze claims that to the extent the Final Four commercial formats were delayed, it was because she was waiting for information from the sales department.[13]  Mauze Counter 56.1 ¶ 115.  While Davis was waiting for a response, Mauze forwarded 185 work emails to her personal email account.  CBS 56.1 ¶ 119.  In addition, on both March 31 and April 1, Jonathan Luftman, CBSSN's Programming Manager, asked Mauze to distribute the commercial formats for the Final Four.  CBS 56.1 ¶¶ 115, 120.  On April 2, Jonathan Zimmerman, CBSSN's Director of Operations and Special Projects, asked for the formats.  CBS 56.1 ¶ 121.  Mauze says that she told Zimmerman and Luftman that Sales had not yet provided the information she needed to build the formats and that she was waiting for information and approval from Correa.  Mauze Counter 56.1 ¶¶ 120-121.

Also on April 2, Weinberg emailed Mauze at 1:50 p.m. with a time-sensitive request for Masters programming traffic instructions.  CBS 56.1 ¶ 123.  Mauze sent him a document at 4:55 p.m., but failed to include the requested information.  CBS 56.1 ¶ 124.  Mauze admits that she did not know the answer to Weinberg's question.  Mauze Counter 56.1 ¶ 124.  Mauze forwarded

---

[12] In addition, Mauze says that she complained to Robert Correa ("Correa"), Senior Vice President of Sports Programming for CBS Television, and Davis that CBSSN needed too much help and needed to take control of their own build-outs.  Mauze Add'l 56.1 ¶ 54.

[13] Mauze asserts that once the formats were approved by Correa, who provided the sales information, she completed CBS formats and emailed them to CBSSN.  Mauze Add'l 56.1 ¶¶ 271-274.

242 emails to her personal email account between 11:07 a.m. and 4:37 p.m. that day. CBS 56.1 ¶ 125.

The following day, on April 3, Luftman twice emailed Mauze to inquire about the status of the "Masters on the Range" commercial formats and rotations—once at 11:49 a.m. and again at 2:01 p.m. CBS 56.1 ¶ 126. Mauze responded at 4:38 p.m. with the same unresponsive document she had provided to Weinberg.[14] CBS 56.1 ¶ 127. As Mauze explains, the document contained "CBS formats that [Luftman] could use to convert and insert CBSSN's sales information" to create his own formats. Mauze Counter 56.1 ¶ 128. It had become "clear to [her] that Luftman was asking [her] to actually do his job and complete CBSSN's commercial formats, not to assist in completing CBSSN's formats." Mauze Counter 56.1 ¶ 127. Luftman asked for the formats again at 4:41 p.m. CBS 56.1 ¶ 128. Mauze asserts that she resent the completed CBS formats to Luftman and that she did not have the CBSSN 2013 formats. Mauze Add'l 56.1 ¶¶ 272, 276.

On Friday, April 4, Zimmerman still had not received the requested formats. CBS 56.1 ¶ 130. He emailed Mauze that at minimum, he needed the logs for Monday. CBS 56.1 ¶ 130. Mauze sent Zimmerman the same document she had sent to Weinberg and Luftman the day before. CBS 56.1 ¶ 131. At 1:24 p.m., Zimmerman explained that Mauze had provided the wrong information, and clarified that he needed the "Master's On the Range 12 P-2P, Monday April 7" format. CBS 56.1 ¶ 133. Luftman emailed at 1:29 p.m. to echo Zimmerman's request, and ask for traffic "re-airs" for 2013. CBS 56.1 ¶ 134; Mauze Add'l 56.1 ¶ 284. Mauze admits that she did not know what this meant, and claims it fell outside of her job description. Mauze

---

[14] Mauze explains that, in addition to Luftman's requests, she was preparing commercial formats for the Final Four and championship games, and trying to participate in a conference call. Mauze Counter 56.1 ¶ 126.

Add'l 56.1 ¶ 285. She admits that she never told Zimmerman that she would or could not provide the information, and alleges that she "g[a]ve him the information so [] he could do his job." Mauze Dep. at 234:15-25. Zimmerman followed up again at 2:19 p.m. CBS 56.1 ¶ 135. Mauze did not respond, nor did she provide Monday's log. CBS 56.1 ¶ 136. She admits that she knew CBSSN needed the formats urgently. Mauze Counter 56.1 ¶ 132. But says she reminded Zimmerman that she did not know who CBSSN's sponsors were or "have the information necessary to build CBSSN's format." Mauze Add'l 56.1 ¶ 265.

Zimmerman notified Power and Davis of Mauze's failure to respond, and at 2:32 p.m., Davis told Mauze that Zimmerman needed an "immediate response." CBS 56.1 ¶ 138. Mauze did not respond. CBS 56.1 ¶ 139. Finally, Davis asked a production assistant to go to Mauze's office to request an immediate response. CBS 56.1 ¶ 140. Mauze's door was locked, and she did not answer it. CBS 56.1 ¶ 141. Mauze explains that she was on a work call and could not respond, but motioned to "give her a minute, and that by the time she was off the phone, the assistant had left the floor." Mauze Counter 56.1 ¶ 141. Davis, Power, and Aagaard discussed Mauze's non-responsiveness and contacted CBS Legal. CBS 56.1 ¶ 142. At 4:40 p.m., Power asked CBS Security to escort Mauze from the building. CBS 56.1 ¶¶ 143-44. From 2:32 p.m. until she left the building, Mauze forwarded an additional 102 work emails to her personal email account. CBS 56.1 ¶ 147. Mauze was formally terminated on Monday, April 7, for insubordination and failure to perform assigned tasks.[15] CBS 56.1 ¶ 150a.

After Mauze was escorted from the building, Davis asked Salmon to build the formats. CBS 56.1 ¶ 150b. Salmon worked until 2:00 a.m. on April 4, and arrived at work at 6:00 a.m. on

---

[15] Mauze alleges that she once referred Luftman to a colleague, Ms. Karmin, a white woman, who told Luftman that she did not "work for [CBSSN]" but rather for CBS. Mauze Add'l 56.1 ¶ 44; Jones Decl., Ex. 5, Karmin 4/17/2013 email to Luftman. Mauze alleges that Karmin was not fired for responding in this way. Mauze Add'l 56.1 ¶ 44.

April 5 to complete Mauze's assignments. CBS 56.1 ¶ 152. In June 2014, Davis hired Salmon as the new Manager, SPS, with a salary of $70,000. CBS 56.1 ¶ 154-55. Salmon has assisted CBSSN with the "Masters on Range" formatting for each of the last three years, a responsibility that requires "less than one hour per year." CBS 56.1 ¶¶ 156a-57a.

## DISCUSSION

Summary judgment is only appropriate if "'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law,'" Ramos v. Baldor Specialty Foods, Inc., 687 F.3d 554, 558 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(a)); see also O'Hara v. Weeks Marine, Inc., 294 F.3d 55, 64 (2d Cir. 2002) (summary judgment warranted where "facts and law will reasonably support only one conclusion") (internal quotation marks and citations omitted). Courts must "resolve all ambiguities and draw all reasonable inferences" against the moving party. Delaney v. Bank of Am. Corp., 766 F.3d 163, 167 (2d Cir. 2014) (internal quotation marks and citations omitted); Walsh v. NYC Hous. Auth., 828 F.3d 70, 74 (2d Cir. 2016) (quoting Aulicino v. N.Y.C. Dep't of Homeless Servs., 580 F.3d 73, 79-80 (2d Cir. 2009)). "Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted." Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) ("irrelevant or unnecessary" factual disputes cannot preclude summary judgment unless "evidence is such that a reasonable jury could return a verdict for the nonmoving party.").

The Second Circuit has "long recognized the need for caution [in] granting summary judgment to an employer in a discrimination case where, as here, the merits turn on a dispute as to the employer's intent." Walsh, 828 F.3d at 74 (quoting Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 101 (2d Cir. 2010)) (internal quotation marks omitted); Simmons v. City of N.Y.,

15

No. 16-CV-1589 (VEC), 2017 WL 6397745, at *6 (S.D.N.Y. Dec. 13, 2017), appeal dismissed (Feb. 23, 2018) ("Because direct evidence of an employer's discriminatory intent will rarely be found, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.") (internal quotation marks and citations omitted).  Still, the purpose of summary judgment—avoiding "protracted and harassing trials [] appl[ies] no less to discrimination cases than to…other areas of litigation." Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2010) (internal quotation marks omitted); see also Campbell v. New York City Transit Auth., 662 Fed. App'x 57, 59 (2d Cir. 2016) (summary order) (courts must "carefully [] distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture.") (internal quotation marks and citations omitted).

### A. Mauze's Title VII, Section 1981, NYSHRL, and NYCHRL Sex and Race Discrimination Claims

Mauze asserts claims of discrimination against CBS pursuant to Title VII, which makes it unlawful for an employer to discriminate against an individual in the context of hiring, discharge, or compensation, based upon that individual's race or sex.  42 U.S.C. §§ 2000e-2(a)(1), 2(a)(2). To survive summary judgment on these claims, Mauze must "withstand the three-part burden-shifting laid out by McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973)." Butler v. N.Y. Health & Racquet Club, 768 F. Supp. 2d 516, 527-28 (S.D.N.Y. 2011) (internal citations and quotation marks omitted); see also Edwards v. Jericho Union Free Sch. Dist., 55 F. Supp. 3d 458, 469–70 (E.D.N.Y. 2014) ("McDonnell Douglas analysis applies to both Title VII discrimination claims and claims under § 1981.  As a result, since plaintiff has not provided sufficient evidence raising a discrimination claim under Title VII, her claims under § 1981 must fail as well.").  Under McDonnell, the burden lies first with the plaintiff to establish a *prima*

16

*facie* race or gender discrimination claim by a preponderance of the evidence. Johnson v. NYC

Dep't of Educ., 633 Fed. App'x 42, 43 (2d Cir. 2016) (summary order) (internal citations and

quotations omitted); see also McKeon v. Kelly, 692 Fed. App'x 650, 651 (2d Cir. 2017)

(summary order); Abrams v. Dep't of Pub. Safety, 764 F.3d 244, 251 (2d Cir. 2014).[16]

    The plaintiff's *prima facie* burden is not an "onerous" one. Texas Dep't of Cmty. Affairs

v. Burdine, 450 U.S. 248, 253 (1981). If it is satisfied, a "presumption of discrimination" is

raised. Id. at 254. The burden then shifts to the defendant to illustrate "a legitimate, non-

discriminatory reason" for its action with respect to the plaintiff. Id. at 252; see also Fletcher v.

ABM Bldg. Value, No. 17-CV-4712 (NRB), 2018 WL 1801310, at *8 (S.D.N.Y. March 28,

2018), appeal filed, No. 18-1232 (2d Cir. April 26, 2018). If the defendant does so, the

presumption of discrimination "drops out of the analysis." Fletcher, 2018 WL 1801310, at *8

(quoting Mario v. P&C Food Mkts., Inc., 313 F.3d 758, 767 (2d Cir. 2010)) (internal quotation

marks omitted). The defendant is then entitled to summary judgment unless the plaintiff

produces evidence "sufficient to permit a rational finder of fact to infer that the defendant's

employment decision was more likely than not based in whole or in part on

discrimination." Walsh, 828 F.3d at 75 (internal quotation marks omitted); see also Cronin v.

Aetna Life Ins. Co., 46 F.3d 196, 203 (2d Cir. 1995) (plaintiff need show only that "prohibited

factor was at least one of the 'motivating' factors") (citations omitted); Musante v. Mohawk

Valley Cmty. Coll., No. 6:15-CV-259, 2017 WL 4155350 (N.D.N.Y. Sept. 18, 2017) ("plaintiff

---

[16] We evaluate "discrimination claims brought under the NYSHRL according to the same standards that we apply to Title VII discrimination claims." See Pucino v. Verizon Wireless Commc'ns, Inc., 618 F.3d 112, 117 n.2 (2d Cir. 2010); see also Fletcher v. ABM Bldg. Value, No. 14-CV-4712 (NRB), 2018 WL 1801310, at *24 (S.D.N.Y. Mar. 28, 2018). As a result, our analysis of Mauze's Title VII and Section 1981 sex and race discrimination claims, her retaliation claims, and her hostile work environment claims governs her NYSHRL claims. See Chepak v. NYC Health & Hosps. Corp., No. 11-CV-9698 KBF, 2015 WL 509279, at *9 n. 15 (S.D.N.Y. Feb. 5, 2015), aff'd, 643 Fed. App'x 62 (2d Cir. 2016) (summary order) ("[C]laims brought under New York State's Human Rights Law are analytically identical to claims brought under Title VII." ); Torres v. Pisano, 116 F.3d 625, 629 n.1 (2d Cir. 1997)).

may show pretext by demonstrating [] weaknesses, implausiblities, inconsistencies, incoherences or contradictions in the employer's proffered legitimate reasons for its action") (internal quotation marks and citations omitted); Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37–38 (2d Cir. 1994) ("Pretext may be demonstrated [] by the presentation of additional evidence showing that the employer's proffered explanation is unworthy of credence, or by reliance on the evidence comprising the prima facie case, without more").

After a careful review of the record, we conclude that CBS is entitled to judgment as a matter of law on Mauze's discrimination claims, which we address in turn. See Moore v. City of New York, No. 15-CV-6600 (GBD) (JLC), 2018 WL 3491286, at *11 (S.D.N.Y. July 20, 2018) (finding summary judgment "'appropriate even in the fact-intensive context of discrimination cases'") (quoting AbduBrisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001)).

### a. Failure to Promote

Mauze alleges that, as a result of discrimination against her based on her race and sex, CBS denied her a promotion to a Director-level role, as well as a commensurate salary. Mauze fails to establish a prima facie case of discriminatory failure to promote. To do so, she must prove that: "(i) [s]he is a member of a protected class; (ii) [s]he applied for and was qualified for a job for which the employer was seeking applicants; (iii) [s]he was rejected for the position; and (iv) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications." Yu v. NYC Housing Dev. Corp., 494 Fed. App'x 122, 124-25, n.5 (2d Cir. 2012) (summary order) (internal quotation marks and citations omitted). At first blush, it is clear that Mauze fails to satisfy the second element of a *prima facie* failure to promote claim: she never applied for a job for which CBS was seeking applicants. Cf Yu, 494 Fed. App'x at 124-25, n.5; see also Fletcher, 2018 WL 1801310, at *9 ("general interest in promotion" is

insufficient to satisfy second element of the *prima facie* case) (internal quotation marks and citations omitted); Petrosino v. Bell Atlantic, 385 F.3d 210, 227 (2d Cir. 2004) (same). Though Mauze inquired about opportunities for advancement to a Director-level role, CBS 56.1 ¶¶ 14, 31, 51-55, she sought to be promoted to Director and to receive a Director-level salary without switching roles or taking on additional responsibilities, CBS 56.1 ¶ 52; see also Gupta v. N.Y.C. Sch. Constr. Auth., 305 Fed. App'x 687, 689-90 (2d Cir. 2008) (plaintiff must allege that she "applied for a specific position [] and was rejected[], rather than merely asserting that on several occasions [she] requested promotion."). Mauze did not express interest in any positions but her own. Cf Petrosino, 385 F.3d at 227 (excusing application requirement if "(1) vacancy [] was not posted, and (2) the employee either had (a) no knowledge of [] vacancy before it was filled or (b) attempted to apply [] through informal procedures"). Because Mauze fails to meet her *prima facie* burden, CBS is entitled to summary judgment on her failure to promote claim.

### b. Failure to Upgrade

Though Mauze argues that CBS failed to *promote* her due to discrimination, her arguments sound more logically in a claim based on CBS's failure to *upgrade* her. See Martinez v. Davis Polk & Wardwell LLP, 208 F. Supp. 3d 480, 488–89 (E.D.N.Y. 2016), aff'd, 713 Fed. App'x 53 (2d Cir. 2017) (summary order) ("prima facie case for failure-to-promote claims is geared towards a move from one position to another. It is ill-suited to an upgrade of an existing position."). An upgrade "involves a change in the title, status, benefits and/or responsibilities of the plaintiff's existing position." See id. To evaluate Mauze's failure to upgrade claim, we follow the approach set forth in Martinez and consider whether Mauze has "offer[ed] evidence that '1) [s]he belonged to a protected class; 2) [s]he was qualified for the position; 3) [s]he suffered an adverse employment action; and 4) the adverse employment action occurred under

19

circumstances giving rise to an inference of discriminatory intent.'" Id. (quoting Terry v. Ashcroft, 336 F.3d 128, 138 (2d Cir. 2003)). We assume, *arguendo*, that Mauze can demonstrate all four elements of the *prima facie* claim. See Chambers, 43 F.3d at 37–38 (discriminatory intent can be inferred from "employer's criticism of [] plaintiff's performance in ethnically degrading terms," "invidious comments about others in [] employee's protected group," or "more favorable treatment of employees not in [] protected group") (citations omitted).

Still, Mauze's claim fails because CBS has articulated legitimate, non-discriminatory reasons for denying her upgrade, and because Mauze has not demonstrated that CBS's reasons are pretextual. See McDonnell, 411 U.S. at 802-03. CBS explains that it denied Mauze's requests for an upgrade because: (1) Mauze's position and responsibilities as Manager, SPS were properly classified; (2) none of Mauze's precedessors in the same role had been upgraded to Director; (3) Mauze's role consisted largely of non-supervisory functions that were not expected to grow or add value to the department beyond its current contribution; and (4) Mauze had not taken on expanded managerial opportunities and did not manage any employees. CBS 56.1 ¶¶ 17, 44, 45, 51-63a.

Mauze fails to present evidence sufficient to rebut these reasons and to show that CBS's unwillingness to upgrade her was pretextual or motivated by discriminatory intent.[17] See Martinez, 208 F. Supp. 3d at 488-89. Her conclusory arguments that CBS—in particular her supervisors Aagaard and Davis—denied her opportunities for advancement or viewed the Manager, SPS job as "women's work," that Davis steered Mauze, Salmon, and Rowinski, into clerical and administrative roles, and that she was "blacklisted" from higher and better-paid

---

[17] In her Responses and Objections to Def. First Request for Interrogatories, Salins Decl. Ex. NN, Mauze stated that she was discriminated against by Davis, Aagaard, Power, and Harris, however, the parties' arguments focus largely on alleged discrimination by Davis, Power, and Aagaard.

positions, are unsubstantiated. See Campbell, 662 Fed. App'x at 60. Mauze also alleges that her supervisors made racially discriminatory comments about gender and race—Davis[18] about his wife and that women should not carry things, and Power in referring to Mauze as "girl," and telling her that she was "too emotional." Mauze Dep. at 256:20-264:14. However, these isolated comments, without more, fail to show that any discriminatory animus played a part in Mauze's supervisors' refusal to upgrade her to Director. See Fletcher, 2018 WL 1801310, at *12 ("the closer the remark's relation to the allegedly discriminatory behavior, the more probative [it is].") (internal quotation marks and citations omitted); see also DeJesus v. Starr Tech. Risks Agency, Inc., No. 3-CIV-1298 (RJH), 2004 WL 2181403, at *10 (S.D.N.Y. Sept. 27, 2004) ("Title VII prohibits certain discrimination; it does protect an employee from general unfairness").

Additionally, Mauze cannot show that she is "similarly situated in all material respects to the individuals" she identifies as comparators. See Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000) (citations omitted). Though we recognize that CBS has not offered particularly clear explanations as to why the comparators Mauze identifies—Dimotheris, a white man, and Burroughs, a black man—were promoted from Manager to Director, Mauze bears the burden of demonstrating that she is sufficiently similar to these individuals. See Walsh, 828 F.3d at 75; Salins Decl. Ex. NN, Mauze's Responses and Objections to Def. First Request for Interrogatories, at 5. Mauze fails to do so. Indeed, she admits that she was not qualified for the Director of Broadcast Operations roles because she was "never [in] broadcast operations" and "didn't do director of broadcast operations." Mauze Counter 56.1 ¶¶ 44-45; Mauze Dep. at 125:2-23; see also CBS 56.1 ¶¶ 44-45. As a result, Dimotheris and Burroughs are not sufficiently similar to Mauze, and are inappropriate comparators. See Forte v. Liquidnet

---

[18] That other women allegedly felt mistreated by Davis does not alter our conclusions at to Mauze's discrimination claims. But see Mauze Counter 56.1 ¶; Mauze Opp'n at 15; Jones Decl., Ex. 35.

21

Holdings, Inc., 675 Fed. App'x 21, 25 (2d Cir. 2017) (plaintiff "bears the burden of proving that the comparator is appropriate"). Our conclusion is bolstered by the record: (1) Burroughs and Dimotheris's Director roles involved skills and expertise Mauze did not have, Burroughs Decl., ECF No. 48; Dimotheris Decl., ECF No. 49; CBS 56.1 ¶¶ 11, 12, 39b; (2) they had previously "perform[ed] many of the same functions, [] with less responsibility and leadership opportunities," while working as Managers of Broadcast Operations, CBS 56.1 ¶ 12; and (3) Oldis recalled that Mauze's functions were "standalone" and would not "add [additional] value to the department and the bottom line," CBS 56.1 ¶ 62a; Oldis Dep. at 91:4-18. As a result, we find that there is no genuine dispute of material fact as to whether Mauze was similarly situated to Burroughs and Dimotheris.[19]

To the extent Mauze suggests that she was similarly situated to Linda Prego, a white woman and CBS employee who was upgraded from Manager to Director of Sales, and with whom Mauze worked, we cannot agree. Mauze suggests that after she was hired, she took on some of the responsibilities that had traditionally been delegated to the Director of Sales. Mauze Add'l 56.1 ¶¶ 10-19. However, even if we accept that Mauze's role as Manager, SPS, involved taking on *some* amount of managerial or Director-level responsibilities, the evidence before us is insufficient to suggest that Mauze's position was analogous to a Director-level one. See Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93, 103 (2d Cir. 2001) ("'[The court's] role is to prevent unlawful hiring practices, not to act as a super personnel department that second guesses employers' business judgments...the plaintiff's credentials would have to be so superior to the credentials of the person selected for the job that no reasonable person, in the exercise of

_____

[19] To the extent Mauze alleges that she was similarly situated to Zimmerman, CBS has proffered sufficient, unchallenged evidence that Zimmerman had greater managerial duties than Mauze, as he "supervis[ed] a team of traffic coordinators and a manager." CBS 56.1 ¶¶ 187-92; Zimmerman Decl., ECF No. 51.

impartial judgment, could have chosen the candidate selected over the plaintiff") (internal quotation marks and citations omitted); see also Moy v. Perez, 712 Fed. App'x 38, 42 (2d Cir. 2017) (citations omitted). Because we find that that there is no material question of fact as to whether Mauze was sufficiently similarly situated to any of the individuals she identifies, and because she fails to present evidence to demonstrate that she was treated differently than others (i.e. not upgraded) on the basis of her race or gender, as opposed to valid business judgments made by individuals at CBS, CBS is entitled to judgment as a matter of law. Cf McGuiness v. Lincoln Hall, 263 F.3d 49, 53-55 (2d Cir. 2001); Martinez, 208 F. Supp. 3d at 486-88; see also Grady v. Affiliated Cent., Inc., 130 F.3d 553, 561 (2d Cir. 1997) ("a genuine issue of fact with respect to pretext alone is not sufficient. There must also be evidence that would permit a rational factfinder to infer that the [adverse employment action] was[] motivated[] by discrimination").

### c. Unequal Pay

Mauze also fails to establish a prima facie case of pay discrimination under Title VII, the Equal Pay Act, and the New York Labor Law §194. To make out a disparate pay claim under Title VII, a plaintiff must demonstrate: (i) that she was a member of a protected class; (ii) that she was paid less than similarly situated employees outside of her protected class for work requiring substantially the same responsibility; and (iii) evidence of discriminatory animus. Martinez, 208 F. Supp. 3d at 488-89 (citing Belfi v. Prendergast, 191 F.3d 129, 139 (2d Cir. 1999)); Quarless v. Bronx-Lebanon Hosp. Ctr., 228 F. Supp. 2d 377, 383 (S.D.N.Y 2002), aff'd, 75 Fed. App'x 846 (2d Cir. 2003) (plaintiff failed to establish discriminatory pay because he "put forward no evidence that he was paid less than other similarly situated employees").

23

A claim of unequal pay for equal work under Title VII...is generally analyzed under the same standards used in an [Equal Pay Act] claim." Tomka v. Seiler Corp., 66 F.3d 1295 (2d Cir. 1995); see also Chiaramonte v. Ctr., No. 13-CIV-5117 (KPF), 2016 WL 299026, at *8 (S.D.N.Y. Jan. 22, 2016), aff'd sub nom. Chiaramonte v. Animal Med. Ctr., 677 F. App'x 689 (2d Cir. 2017) (EPA claims are analyzed under "burden-shifting framework similar to that established in McDonnell"). More specifically, to bring a claim for pay discrimination based on sex under the EPA, a plaintiff must show "that '[i] the employer pays different wages to employees of the opposite sex; [ii] the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and [iii] the jobs are performed under similar working conditions.'" Chiaramonte, 2016 WL 299026, at *8; see also Tulino v. City of N.Y., No. 15-CV-7106 (JMF), 2018 WL 1568970, at *3 (S.D.N.Y. Mar. 27, 2018) (quoting EEOC v. Port Auth. Of N.Y. & N.J., 768 F.3d 247, 254-55 (2d Cir. 2014)) (internal quotation marks omitted). "[P]roof of the employer's discriminatory intent is not necessary." Belfi, 191 F.3d at 136. Equal pay claims brought pursuant to the New York Labor Law § 194 are "analyzed under the same standards [as the] Equal Pay Act." Chiaramonte, 2016 WL 299026, at 9 (quoting Talwar v. Staten Island Univ. Hosp., 610 Fed. App'x 28, 31 n.2 (2d Cir. 2015) (summary order)) (internal quotation marks and citations omitted).

The essence of Mauze's pay discrimination claims is the same as that of her failure to upgrade claim: that she took on responsibilities greater than that of a Manager and was not compensated accordingly. They fail for the same reasons. Mauze has not demonstrated that she received unequal pay for equal work. See Martinez, 208 F. Supp. 3d at 488-89 (citing EEOC, 768 F.3d at 255); see also Chiaramonte, 2016 WL 299026, at *10 (plaintiff "must establish that the jobs compared entail common duties or content, and do not simply overlap in titles or

classifications") (internal quotation marks and citations omitted).  Nor has she shown that her job was "substantially equal in skill, effort, and responsibility" as those of her alleged comparators, or that they are "performed under similar working conditions."  See Tulino, 2018 WL 1568970, at *3.  Furthermore, CBS has demonstrated that Mauze was not in fact paid less than other Managers at CBS, specifically, those she identifies as comparators.  Mauze was paid $70,000 per year when she started as a Manager, SPS—more than her predecessor (a white woman), was ever paid in the same role, and more than Dimotheris (a white man), was paid when he was promoted to Manager, Broadcast Operations.[20]  CBS 56.1 ¶¶ 183-184, 186.  CBS also notes that Mauze was paid more than Luftman when he was hired as Manager of College Sports.  CBS 56.1 ¶ 185.

Furthermore, for the reasons explained, supra, no rational jury could find that CBS's proffered non-discriminatory reasons for Mauze's Manager title and corresponding salary are false or pretextual, and Mauze has not raised a genuine issue of material fact with respect to whether her race or gender was a factor in her compensation.  See Chepak, 2015 WL 509279, at *13.  Summary judgment is warranted on Mauze's Title VII, EPA, and New York Labor Law compensation discrimination claims.

### d. Discriminatory Termination

Mauze fails to establish a *prima facie* case of discriminatory termination under Title VII, Section 1981, or the NYSHRL.  In order to survive summary judgment on her termination claim, Mauze must demonstrate her: "(1) membership in a protected class; (2) qualification for the position and satisfactory performance of her job; (3) adverse employment action; and (4) circumstances giving rise to an inference of discrimination."  Johnson, 633 Fed. App'x at 43 (internal citations and quotations omitted); see also McDonnell, 411 U.S. at 802.  There is no

---

[20] Although CBS has not provided information about Burroughs's salary when he was Manager of Broadcast Operations, Mauze fails to demonstrate that it was greater than her own.

dispute that Mauze was a member of protected classes based on her race and gender, and that she was terminated (i.e. experienced an adverse employment action). And there is no dispute that her termination constituted an adverse employment action. See Mathirampuzha v. Potter, 548 F.3d 70, 78 (2d Cir. 2008) (adverse employment action is a "materially adverse change in the terms and conditions of employment") (quoting Sanders v. N.Y.C. Human Res. Admin., 361 F.3d 749, 755 (2d Cir. 2004)) (internal quotation marks omitted). The parties dispute whether Mauze was qualified for her position and satisfactorily performing her job at the time of her termination, and whether circumstances surrounding her termination give rise to an inference of discrimination. See Johnson, 633 Fed. App'x at 43. However, even after construing all facts before us in favor of Mauze, we cannot conclude that she was satisfactorily performing her job at the time of her termination. As a result, her *prima facie* termination claim fails.

As recited above, in the months leading up to her termination, Mauze engaged in a series of behaviors that were unprofessional, disruptive, and impeded her colleagues' abilities to complete urgent tasks. The most egregious of these behaviors include Mauze:

- (1) Singing "this is not my job" at work, CBS 56.1 ¶ 66a; Mauze Dep. at 55:3-6.
- (2) Refusing to work until a colleague retrieved a chair for her, when one was missing from her work station, CBS 56.1 ¶¶ 67-69;
- (3) Refusing to sit in at a work station farther back in the studio than her usual seat, CBS 56.1 ¶¶ 75-81;
- (4) Failing to go in to work on two consecutive Sundays during a busy time, and failing to give notice that she was staying home sick until 10:43 a.m. and 10:52 a.m., respectively, CBS 56.1 ¶¶ 93a-95a;
- (5) Declining to answer certain questions of the individuals Davis arranged to have substitute for her while she was on vacation, CBS 56.1 ¶¶ 100-103;
- (6) Failing to complete urgent tasks or alert her colleagues that she was unable or unwilling to do so, with respect to CBS's Masters on the Range programming, CBS 56.1 ¶¶ 115-140;
- (7) Forwarding hundreds of work emails to her personal email account while urgent requests were being asked of her, CBS 56.1 ¶¶ 119, 125, 147; Salins Decl. Ex. Z; and
- (8) Failing to answer the door when an assistant went to inquire about the status of these urgent requests, CBS 56.1 ¶ 141.

Even accepting Mauze's assertion that the requests made of her in connection with CBSSN's "Masters on the Range" were not within her job description—a premise we find unsupported by the record—we cannot conclude that her behavior was professional or that CBS was unjustified in terminating her based on the series of events that had transpired. No reasonable jury could find that Mauze's failure to communicate to her colleagues that she could not, or would not, assist with their urgent requests constitutes professional behavior. ·

In any event, even if Mauze could meet the elements of the *prima facie* case, CBS has more than sufficiently illustrated legitimate, non-discriminatory reasons—replete with clearly documented performance issues—for Mauze's firing on April 4, 2014. See Johnson, 633 Fed. App'x at 43. Conceivably, Mauze could argue that her termination was an over-reaction to her performance failures. However, she has not identified any evidence to suggest that CBS was satisfied with her work, or that discrimination was the real reason for her termination. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993); see also Orisek v. Am. Inst. of Aeronautics & Astronautics, 938 F. Supp. 185, 191 (S.D.N.Y. 1996), aff'd, 162 F.3d 1148 (2d Cir. 1998) (plaintiff's "disagreement with her employer's perceptions of her job performance does not satisfy her burden of showing that the [] proffered justification was a pretext for discrimination.") (citations omitted). The allegedly discriminatory comments discussed in the context of Mauze's failure to upgrade claim, and the conclusory accusations she makes about workplace gender and race discrimination, are insufficient to satisfy her burden under McDonnell, 411 U.S. 792. See McLee v. Chrysler Corp., 109 F.3d 130, 136-37 (2d Cir. 1997) (record "foreclose[d] any inference that [plaintiff's] job performance was satisfactory…[and] there [was] no evidence [] from which it could rationally be inferred that [his] allegations of discrimination…played any part in [defendant's] decision to fire [him.]"). CBS is entitled to

summary judgment on Mauze's discriminatory termination claim. See Reeves v. Sanderson

Plumbing Prods., Inc., 530 U.S. 133, 143 (2000) ("burden of persuading [] trier of fact that []

defendant intentionally discriminated...remains at all times with the plaintiff"); see also Fleming

v. MaxMara USA, Inc., 371 Fed. App'x 115, 117 (2d Cir. 2010).

### e. NYCHRL Discrimination Claims

We analyze Mauze's discrimination claims under the NYCHRL "independently from"

and more broadly than her federal and state claims. See Thomson v. Odyssey House, No. 14-

CV-3857 (MKB), 2015 WL 5561209, at *23–26 (E.D.N.Y. Sept. 21, 2015), aff'd, 652 Fed.

App'x 44 (2d Cir. 2016). The NYCHRL forbids " '[A]n employer or an employee or agent

thereof, because of the actual or perceived age, race, ... [or] national origin ... to discriminate

against [a] person  in compensation or in terms, conditions or privileges of employment.'"

Sotomayor v. City of N.Y., 862 F. Supp. 2d 226, 257–58 (E.D.N.Y. 2012), aff'd, 713 F.3d 163

(2d Cir. 2013) (quoting NYCHRL). As a result, to "state a claim for discrimination under the

NYCHRL, a plaintiff must only show differential treatment of any degree based on a

discriminatory motive." Thomson, 2015 WL 5561209, at *24 (quoting Gorokhovsky v. NYC

Hous. Auth., 552 Fed. App'x 100, 102 (2d Cir. 2014)). "[E]ven under this more liberal pleading

standard, a plaintiff must plausibly allege that she was subjected to unequal treatment because of

her protected characteristic." Id.; see also Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.,

715 F.3d 102, 110 (2d Cir. 2013) ("plaintiff need only demonstrate by a preponderance of the

evidence that she has been treated less well than other[]s [at least in part] because of her"

protected status) (internal quotation marks and citations omitted).

We are mindful that claims under the NYCHRL must be treated more liberally than those

brought under Title VII and the NYSHRL, and that "even a single comment may be actionable in

the proper context." Mihalik, 715 F.3d at 113 (citations omitted); Sotomayor, 862 F. Supp. 2d at 258 (under the NYCHRL, a "plaintiff must simply show that she was treated differently from others in a way that was more than trivial, insubstantial, or petty"); but see Ardigo v. J. Christopher Capital, LLC, No. 12–CV–3627, 2013 WL 1195117, at *4 (S.D.N.Y. Mar. 25, 2013). However, the NYCHRL "is not a general civility code." See Mihalik, 715 F.3d at 113. As with Mauze's federal and state discrimination claims, she has not shown that she was treated differently with respect to her pay, title, or termination because of any race or gender-based discriminatory motives harbored by individuals at CBS. CBS is entitled to summary judgment on Mauze's NYCHRL discrimination claims. See Sotomayor, 862 F. Supp. 2d at 258 ("plaintiff must still link the adverse employment action to a discriminatory motivation").

## B. Mauze's Retaliation Claims Under Title VII, Section 1981, the NYSHRL,[21] and the NYCHRL

Mauze alleges that CBS—in particular Davis, Aagaard, Harris, Oldis, and Gutierrez—retaliated against her due to her internal complaints about lack of promotional opportunities and discrimination, as well as her subsequent EEOC complaint. See Salins Decl., Ex. NN at 2. To establish a *prima facie* case of retaliation, a plaintiff must show: "(1) that she participated in a protected activity, (2) that she suffered an adverse employment action, and (3) that there was a causal connection between her engaging in the protected activity and the adverse employment action." Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 110 (2d Cir. 2010). If the plaintiff does demonstrates the *prima facie* elements, the burden moves to the defendant to "proffer a legitimate, non-retaliatory reason" for the adverse employment action. Fletcher, 2018 WL 1801310, at *19 (quoting Treglia v. Town of Manlius, 313 F.3d 713, 721 (2d Cir. 2002))

---

[21] The "substantive standards for liability under [Title VII and Section 1981]" and the NYSHRL are "coextensive." Fletcher, 2018 WL 1801310, at *24.

(internal quotation marks and citations omitted). To survive summary judgment, the plaintiff must "then show that retaliation was a 'but for' cause of the adverse action, not simply a 'substantial' or 'motivating' factor." Id. (quoting Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 362-63 (2013)); see also Meyer v. Shulkin, 710 Fed. App'x 453, 456 (2d Cir. 2017), as amended (Oct. 11, 2017), cert. denied, 138 S. Ct. 1010 (2018).

We agree with Mauze that she establishes a *prima facie* case of retaliation. There is no serious dispute that Mauze engaged in protected activity. See Littlejohn v. City of N.Y., 795 F.3d 297, 316-19 (2d Cir. 2015) (citing Title VII § 704(a)). Nor is there serious dispute that, of the alleged retaliatory actions Mauze identifies,[22] her termination qualifies as an adverse action. See Fletcher, 2018 WL 1801310, at *21 ("To establish an adverse employment action for purposes of a retaliation claim, a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination.") (quoting Fincher v. Depository Trust & Clearing Corp., 604 F.3d 712, 720 (2d Cir. 2010)) (internal quotation marks omitted); see also Ibok v. Secs. Indust. Automation Corp., 369 Fed. App'x 210, 214 (2d Cir. 2010) (plaintiff suffered adverse actions "in the form of warnings, a negative performance review, [] elimination of his shift, and, [] his firing"); Moore v. City of N.Y., No. 15-CV-6600 (GBD) (JLC), 2018 WL 3491286, at *18–22 (S.D.N.Y. July 20, 2018).

Mauze has also established a sufficient causal connection between her engagement in protected activity and her termination. See Gordon v. NYC Bd. of Educ., 232 F.3d 111, 117 (2d

---

[22] Mauze claims that CBS retaliated against her in response to her complaints about the lack of promotional opportunities in the summer and fall of 2013 by "significantly diminish[ing] her material responsibilities, and [because] Power subjected her to racial mockery and ridicule for her past complaints." Mauze Opp'n at 11-12. She also claims that, after she filed her EEOC Charge of Discrimination in December 2013, she was "subjected to a manufactured and unwarranted performance warning" and later terminated without justification. Id. at 12; Mauze Counter 56.1 ¶ 84 ("Up until a month of the filing of her Charge of Discrimination, Ms. Mauze had never been counseled that she was 'unreliable,' difficult or had any other performance deficits.").

Cir. 2000) (causation can be shown by either: "1) indirectly[] showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or 2) directly[] [presenting] evidence of retaliatory animus against plaintiff by defendant.") (citations omitted); see also Hicks v. Baines, 593 F.3d 159, 164, 170 (2d Cir. 2010). In this case, the time between the "events that precipitated the adverse action[]"—Mauze's complaints to her supervisors in the summer and fall of 2013, and her EEOC complaint submitted in December 2013—and "the adverse action[] itself"—Mauze's termination in early April 2014—is sufficient to make out a prima facie showing of causation through temporal proximity. See Moore, 2018 WL 3491286, at *21 (citing Gorzynski, 596 F.3d at 110); see also Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons, 842 F.2d 590, 593 (2d Cir. 1998) ("adverse action and [] protected activity may be established through evidence of retaliatory animus directed against a plaintiff by a defendant...or by showing that the protected activity was closely followed in time by the adverse action.") (internal quotation marks and citations omitted); Ibok, 369 Fed. App'x at 213 ("[a] temporal relationship between the protected activity and the adverse action—even when they are as much as five months apart—can establish a prima facie case of retaliation"); but see Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 95 (2d Cir. 2001) ("[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise."); Clark Cty Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001) (three-month period between protected activity and adverse action did not satisfy proximity requirement). Our conclusion is bolstered by the fact that CBS allegedly prepared its response to Mauze's EEOC complaint in

February 2014, just before she received her final performance warning, and less than two months before she was ultimately fired. Mauze Counter 56.1 ¶ 105.

As explained, supra, CBS offers legitimate, non-discriminatory reasons for Mauze's termination. See Burdine, 450 U.S. at 253. However, Mauze sufficiently rebuts these explanations with evidence that they are pretext for retaliation, as opposed to the "culmination of gradual adverse job actions." See Martinez, 713 Fed. App'x at 57; Hicks, 593 F.3d at 164-65 (plaintiff sufficiently demonstrates pretext by showing that "retaliatory motive played a part in the adverse employment actions even if it was not the sole cause."). First, she notes that, after lodging an internal complaint against Davis, he was allegedly angry with her and "was not talking to her." Mauze Opp'n at 14. Though Oldis testified that he did not recall Davis being upset by Mauze's complaints, Oldis Dep. at 86:5-16, an email Davis sent to Oldis mentions the "tire marks" on his back as a result of Mauze's complaint, Jones Decl., ECF No. 54 ("Jones Decl."), Ex. 16, Davis email of 10/4/2013. Though not dipositive of whether Davis did in fact retaliate against Mauze by participating in her firing, these comments are sufficient to raise a question of material fact as to Davis's intent. See Dillon v. Ned Mgmt., Inc., 85 F. Supp. 3d 639, 665 (E.D.N.Y. 2015) ("There is a need for caution about granting summary judgment to an employer in a discrimination case where the merits of the case turn on a dispute as to the employer's intent.") (citations omitted).

Second, Mauze points to Power's December 1, 2013 suggestion that they start documenting Mauze's performance. Jones Decl., Ex. 47, Power Dep. at 105:1-6. Though this occurred before CBS had notice of Mauze's EEOC complaint, it occurred *after* Mauze complained about Harris in September 2012, about Burroughs's promotion in August 2013, and about her workstation incidents in September and November 2013. This chronology raises a

material question of fact as to whether Power was motivated by retaliatory animus when she participated in Mauze's termination. See Chertkova v. Conn. Gen. Life, Ins. Co., 92 F.3d 81, 93 (2d Cir. 1996) (it was plausible that defendant created record "aimed at rationalizing plaintiff's termination" where facts were not merely "conclusory allegations"). Though we recognize that CBS's proffered, non-discriminatory reasons for this comment (that Mauze's behavior had declined and required documentation), we must construe all facts in favor of Mauze. In light of Mauze's claim that she was not responsible for providing CBSSN's commercial formatting for "Masters on the Range," a material question of fact also remains as to whether the performance issues CBS identifies were valid, or if they were exaggerated. See Mugavero v. Arms Acres, Inc., 680 F. Supp. 2d 544, 562 (S.D.N.Y. 2010) (pretext may be inferred where employer "exaggerated the seriousness of the conduct that allegedly justified the adverse action"). A reasonable jury could conclude that CBS's treatment of Mauze "in the wake of her [complaints and] EEOC filing…was retaliatory'" Cf Martinez, 713 Fed. App'x at 56–57; Georges v. Peters, 581 Fed. App'x. 80, 80 (2d Cir. 2014) (summary order); see also Treglia v. Town of Manlius, 313 F.3d 713, 721 (2d Cir. 2002). And it could also conclude that CBS's retaliatory motive was the but-for cause of her termination. See Univ. of Tex. Southwestern Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2533 (2013); Dillon, 85 F. Supp. 3d at 664 (whether retaliation was a but-for cause is "particularly poorly suited to disposition by summary judgment").

Mauze states a valid retaliation claim under the NYCHRL as well. See Dimitracopoulos v. City of N.Y., 26 F. Supp. 3d 200, 217 (E.D.N.Y. 2014) (citing Dixon v. Int'l Fed. of Accountants, 416 Fed. App'x. 107, 110 n.1 (2d Cir. 2011)) (to "prevail on a NYCHRL retaliation claim, a plaintiff must show: 1) he engaged in a protected activity; 2) his employer was aware of that activity; 3) he suffered an action that would be reasonably likely to deter a

person from engaging in a protected activity; and 4) that there was a causal connection between the protected activity and the action.'"). Unlike retaliation claims brought under Title VII, "the employer's conduct need not be as severe to trigger liability" under the NYCHRL. <u>Sotomayor v. City of N.Y.</u>, 862 F. Supp. 2d 226, 262 (E.D.N.Y. 2012), <u>aff'd</u>, 713 F.3d 163 (2d Cir. 2013). The employer's actions must only be "'reasonably likely to deter a person from engaging in protected activity.'" <u>Dimitracopoulos</u>, 26 F. Supp. 3d at 217 (quoting N.Y.C. Admin. Code § 8-107(7)).

Summary judgment is denied with respect to Mauze's Title VII, Section 1981, NYSHRL, and NYCHRL retaliation claims.

### C. Mauze's Hostile Work Environment Claims Under Title VII, Section 1981, the NYSHRL,[23] and the NYCHRL

Mauze brings hostile work environment claims under Title VII, Section 1981, the NYSHRL, and the NYCHRL.[24] "To establish a prima facie case of hostile work environment, the plaintiff must show that the discriminatory harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment and that a specific basis exists for imputing the objectionable conduct to the employer." <u>Tolbert v. Smith</u>, 790 F.3d 427, 439 (2d Cir. 2015) (quoting <u>Perry v. Ethan Allen, Inc.</u>, 115 F.3d 143, 149 (2d Cir. 1997)) (internal quotation marks omitted). It is "axiomatic" that the alleged hostile conduct must have "occurred because of a protected characteristic." <u>Id.</u> "As a general rule, incidents must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" <u>Id.</u> "Isolated incidents usually will not suffice to establish a

---

[23] "Hostile work environment claims under the NYSHRL are analyzed under the same standard as Title VII hostile work environment claims." <u>Edwards v. Jericho Union Free Sch. Dist.</u>, 55 F. Supp. 3d 458, 467 (E.D.N.Y. 2014) (internal quotation marks and citations omitted); <u>see also Kelly v. Howard I. Shapiro & Assocs. Consulting Engineers, P.C.</u>, 716 F.3d 10, 14 (2d Cir.2011); <u>Fletcher</u>, 2018 WL 1801310, at *24. As a result, our analysis as to Mauze's Title VII and Section 1981 hostile work environment claims governs her related NYSHRL claim as well.
[24] Mauze claims that Davis, Aagaard, Power, Harris, and Oldis contributed to her hostile work environment. <u>See</u> Salins Decl., Ex. NN at 2.

34

hostile work environment, although we have often noted that even a single episode of harassment can establish a hostile work environment if the incident is sufficiently 'severe.'" Campbell v. New York City Transit Auth., 662 Fed. App'x 57, 60 (2d Cir. 2016) (summary order) (quoting Redd v. N.Y. Div. of Parole, 678 F.3d 166, 175–76 (2d Cir. 2012)).  In evaluating "whether a plaintiff has met this burden, courts should examin[e] the totality of the circumstances, including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victim's [job] performance." Rivera v. Rochester Genesee Reg'l Transp. Auth., 743 F.3d 11, 20 (2d Cir. 2014) (internal quotation marks and citations omitted); see also Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993).

As we have already detailed, Mauze alleges that her workstation was not properly set up for her use on two separate occasions.  Mauze Add'l 56.1 ¶¶ 133-166; see also Mauze Opp'n at 24.  Second, she alleges that Power referred to her as "girl," in relation to the second of these work station incidents, and said that she was too emotional.  Mauze Add'l 56.1 ¶ 151; Mauze Dep. at 262:16-263:19.  Third, she alleges that Davis made sexist comments about women and "set[] a tone early in [] training sessions [with Nomikos] that [] Mauze was undeserving of respect."  Mauze Dep. at 256:20-264:14; Mauze Add'l 56.1 ¶ 182; Mauze Opp'n at 24-25.  Fourth, she alleges that, following her complaint about his promotion, Burroughs refused to talk to her, and that Davis was angry with her after she complained about his conduct.  Mauze Add'l 56.1 ¶ 108; Mauze Opp'n at 14.  Finally, she alleges that she was both "'stripped" of her managerial responsibilities, and that she was required to do work that was not within her job description.[25]  Mauze Counter 56.1 ¶¶ 64; 108.

---

[25] Mauze also suggests that the performance warning she received contributed to her hostile work environment. Mauze Opp'n at 25.

Mauze's allegations require little analysis. She is unable to demonstrate that the conduct alleged rose to the level of pervasive hostility that is required to survive summary judgment. See Gorzynski, 596 F.3d at 102 (plaintiff must demonstrate that workplace is so "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."); Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997) (for race or sex-based "comments, slurs, and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial [or sexist] enmity, meaning…a steady barrage of opprobrious racial [or sexist] comments") (internal quotation marks and citations omitted); see also Fleming, 371 Fed. App'x at 119 (work environment not hostile where "defendants wrongly excluded [plaintiff] from meetings, excessively criticized her work, refused to answer work-related questions, arbitrarily imposed duties outside of her responsibilities, threw books, and sent rude emails to her," and plaintiff was subjected to one racially-motivated comment). Nor has she demonstrated that any allegedly hostile incidents occurred "because of her membership in a protected class." Brennan v. Metro. Opera Ass'n Inc., 192 F.3d 310, 318 (2d Cir. 1999).

We recognize that Mauze experienced what she perceived as unpleasantries and hostility at CBS. However, under the law, an unpleasant work environment does not amount to a hostile one. See Harris, 510 U.S. at 23; see also Moore, 2018 WL 3491286, at *17 (actions were "episodic at best and occurred for nondiscriminatory, departmental policy reasons"). Viewing the facts in the light most favorable to Mauze, the allegedly race and gender-related, discriminatory comments she identifies are simply "not the type of intolerable alteration of her working conditions that substantially interferes with her ability to do her job." Fleming, 371 Fed. App'x at 118 (internal quotation marks and citations omitted). Mauze also fails to "connect

[these] comment[s] to her other allegations of unfair treatment, which are not facially related to her race [or gender]." See id. at 119.

We review Mauze's NYCHRL hostile work environment claims more liberally than her federal and state claims. See id.; see also Sotomayor, 862 F. Supp. 2d at 261 ("defendants' discriminatory conduct need not be severe or pervasive to create an actionable hostile work environment") (internal quotation marks and citations omitted). The NYCHRL is designed to ensure that that discrimination plays "no role in the workplace." Mihalik, 715 F.3d at 114 (internal quotation marks and citations omitted). However, defendants "can still avoid liability if they prove [as an affirmative defense] that the conduct complained of consists of nothing more than what a reasonable victim of discrimination would consider 'petty slights and trivial inconveniences.'" Sotomayor, 862 F. Supp. 2d at 261. Because we find that there is no "triable issue of fact as to whether [Mauze] [was] treated less well than other employees" due to her race or gender, CBS is entitled to summary judgment on her NYCHRL and other hostile work environment claims. See id.

## CONCLUSION

The question before us is whether race or gender had anything to do with Mauze's dissatisfaction with and ultimate termination from CBS, or the hostility she perceived. More specifically, the question presented is whether a genuine issue of material fact exists as to whether the reasons proffered by CBS for its adverse employment action towards Mauze were in any sense a pretext for unlawful discrimination. Recognizing that we must be alert to any identifiable suggestion of discriminatory incentive or design, and accepting Mauze's non-conclusory version of events, we conclude, without hesitation, that Mauze fails to present a triable issue of fact on any of her discrimination claims. On the other hand, despite substantial

37

doubt as to the viability of her retaliation claims, the Court concludes that the circumstances and timing of Mauze's termination permit an inference of retaliatory animus and warrant a resolution by the finder of fact. The motion for summary judgment is granted with respect to Mauze's discrimination and hostile work environment claims, and denied as to her claims of retaliation.

SO ORDERED:

Dated: October 17, 2018
Brooklyn, New York

s/ RJD

RAYMOND J. DEARIE
UNITED STATES DISTRICT JUDGE